Joshua Lapin, Pro Se Plaintiff

401 E 8th ST
STE 214 PMB 7452
Sioux Falls SD 57103

Email: thehebrewhammerjosh@gmail.com

Facsimile: (605) 305-3464

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### IN AND FOR SAN JOSE

| | |
|---|---|
| Joshua Lapin | Case No.: 5:2022cv03158 |
| Plaintiff, | |
| vs. | **PLAINTIFF'S RESPONSE TO AML'S MOTION TO DISMISS THE COMPLAINT UNDER RULE 12(B)(1), (2), AND 12(3), OR IN THE ALTERNATIVE FOR FAILURE TO STATE A CLAIM UNDER RULE 12(B)(6)** |
| AML Network Limited dba Qpid Network | |
| John Doe Senders 0-5 | |
| Defendant | |

1
COMPLAINT

# Introduction

**"This Court lacks personal jurisdiction over AML...there is no venue for this dispute...[Hong Kong based] AML has no contacts with California and did not send the Emails in California"**

AML Network Limited admits in a declaration that it owns the Qpid Network (Document 26-3, Declaration of Chan Kai Yu Rudy, ¶11).  The Qpid Network developed and operates at least three apps on the Google Play Store named "Latam Date, CharmDate, and Qpid Network." (Complaint, Pages 32-34)   Accordingly, AML Network Limited aka Qpid Network has agreed to the Google Terms of Service in its proliferation of the Qpid Network and Qpid Network sites through the Google Play Store.  Your Honor will see that the preservations of the spams in the complaint's Exhibit A (beginning on page 54) are similar to the images and depictions of the Qpid Network's Google Apps as shown in the complaint Pages 32-34.  Further, the landing pages of many-or-all of the spams are websites owned by the Qpid Network (complaint, pages 15-19).  AML admits ownership of these domains.  "Attached hereto as Exhibit B1 through B5, are true and correct copies of the terms and conditions for each of the Websites." (Declaration of Chan Kai Yu Rudy, ¶22), whereas the aforementioned Exhibit's B1 through B5 are in complete agreement with plaintiff's corresponding exhibits in the (complaint, pages 15-19).  Those domains were "advertised" within the spams, whereas the cause of action imposes [strict] liability onto those who advertise in a spam, regardless if the advertiser directly sent the spams or if a third party sent the spams.   In fact, this court found that a company who sent a spam email is not liable under the near-identical cause of action Cal. Prof. & Bus. § 17529.5 "unless such sender is also an advertiser, to be liable under § 17529.5" *Blanchard v. Fluent, Inc*., No. 17-cv-04497-MMC (N.D. Cal. Sep. 22, 2017).  While plaintiff will go on record respectfully disagreeing with this courts finding in *Blanchard* that an "initiator" is not liable under 17529.5, *Id* represents that AML is the very type of company that *would* be liable under this cause of action, since it "advertised" in the spams, rather than sending the spams.  Returning to the personal jurisdiction analysis, AML agreed to the Google Terms of Service.  Plaintiff also agreed to the Google Terms of Service because he received all of the spams at issue at his Google gmail email address, thehebrewhammerjosh@gmail.com.  Even

though third parties sent the spams to plaintiff's gmail email address, AML directly is a party to the same Google Terms of Service agreement as plaintiff, and the following provisions of that contract are particularly relevant to AML's directly taken actions, as copied from (complaint ¶ 32)

*respect the rights of others, including privacy and intellectual property rights*

AML Network Limited has been used in the State and Federal Courts of California several times before for the virtually-identical California Spam law cause-of-action Bomberger V Asia Maritus Limited, Lynch V AML Network Limited, for advertising in very, very similar spams to the ones this plaintiff has received. As such, AML is "on notice" that these spams are illegal under Federal andState Laws of the United States, and clearly has failed to implement systems to prevent the sendingof such UCE's through the affiliates of its Qpid Network. As such, AML has proven it does not respect plaintiff's "rights" under applicable law, nor the rights of his fellow South Dakotans, Americans, or residents of other US States through its repeated, chronic failure to stop "giving rise" to these tortious, obnoxious, and unlawful spam emails. As such, AML violates the "respect the rights of others", portion of the Google Terms of Service.

***don't abuse or harm others*** *or yourself (or threaten or **encourage** such abuse or harm) — for example, by misleading, defrauding, illegally impersonating, defaming, bullying, harassing, or stalking others*

Even though AML is not alleged to have sent these spams, rather it is alleged to have ("Advertised") in and through their use, AML absolutely has a long history of encouraging such abuse or harm, as demonstrated above in its previous similar litigations, and its failure to stop the continued proliferation of unlawful spams advertising the Qpid Network's sites, as sent by its third parties. As such,AML's negligence at best, or malice at least, constitutes overwhelming "encouragement" of the "abuse or harm[ing] of others"

All of the spams were sent to Plaintiff's Gmail email address. AML, being entirely "on notice" of the unlawfulness of these spams pursuant to its past litigations in California courts for a near-identical cause-of-action, failed to gain reasonable control over the marketing practices of the

affiliates of its Qpid Network, and resulted in at least 223 separate unlawful spams being received to just this plaintiff at the plaintiff's [Google] gmail email address.  Who knows how many other gmail users were blasted with countless spams as part of the same 'marketing'. Beyond a doubt, this interferes with Google's Gmail service, puts strain on its servers, and disrupts the services of Google and its users' ability to enjoy and utilize such services.

> *Google reserves the right to suspend or terminate your access to the services or delete your Google Account if any of these things happen:*
> *...[inter alia]....*
>
> *your conduct causes **harm or liability to a user**, third party, or Google — for example, by hacking, phishing, harassing, spamming, misleading others, or scraping content that doesn't belong to you*

The conduct of ("Advertising") within UCE's of this nature constitutes liability onto "a user [of Google]," which in this case happens to be the South-Dakotan Plaintiff. Spamming is directly and specifically mentioned vis-a-vis "harm or liability to a user."  AML's contention that "Merely using Google in some manner unrelated to Plaintiff's lawsuit cannot subject AML to general personal jurisdiction in California."  He cites to *CrossFit, Inc. v. Fitness Trade* sp. z o.o., 2020 U.S. Dist. LEXIS 204853 in support of the same.  But this is misguided; AML did use and abuse Google, and its terms of service, in a manner related to [the instant] Plaintiff's lawsuit, and the cause of action arises out of, or at least related to, AML's acceptance of the terms of service with Google LLC.

AML Consented to the Personal Jurisdiction of This Court, for this cause of action, through the forum selection clause of the Google Terms of Service.  Under "Settling disputes, governing law, and courts," the Terms of Service states:

> *California law will govern all disputes **arising out of or relating** to these terms, service-specific additional terms, or any related services, regardless of conflict of laws rules. These disputes will be resolved exclusively **in the federal or state courts of Santa Clara County, California**, USA, and you and Google consent to personal jurisdiction in those courts.*

Plaintiff is not and does not pretend to be Google LLC, but he is a party to the same terms of service agreement as AML, and this agreement protects Google Users from the abuse of Google's services, and the parties' consent to the jurisdiction of this court for disputes "arising out of or relating" to these terms.  A reasonable google user can expect to have their Google-related causes of action

which relates to these terms of service to be heard in the State and Federal Courts of Santa Clara, California.  By the same token, a reasonable Google User can expect to have their Google-related torts which relate to these terms of service to be heard in the State and Federal Courts of Santa Clara, California.  The fair warning and minimum [and relevant] contact(s) are present in such circumstances, and no where within the terms of service are third party beneficiaries excluded.  For these reasons, the venue plaintiff selected for this case is the Northern District of California's courthouse closest to Google's Headquarters address of 1600 Amphitheatre Parkway Mountain View, California.

**"Plaintiff does not sufficiently allege AML is liable for the Emails. In fact, Plaintiff concedes AML did not send the Emails, and he does not allege AML authorized the sending of the Emails...Plaintiff makes no allegations that AML even *knew* of the Emails..."**

Despite being in receipt of this complaint for many, many months, AML's counsel has the above "completely backwards," and completely the reverse of what this court has found.  As discussed earlier, this court found in *Blanchard* that the third party sender (Panda Mail) was not liable under 17529.5 because it merely sent the spam and did not "advertise" in the email.  In the instant matter, AML *is* the very "advertiser" the *Blanchard* court...<u>this court...</u>found to be liable for the same.

**"AML did not purposefully avail itself of the privilege of conducting business in California"**

Defendant cites to a handful of cases in which courts have declined to exercise personal *specific* jurisdiction over non-residents when the only link between the Defendant and the forum was that a third-party sent a spam email or telemarketing call into a forum, such as *Zoobuh, Inc. v. Williams*, 2014 U.S. Dist. LEXIS 175737, at *1, *13-14 (D. Utah. Dec. 18, 2014) (granting defendant's motion to dismiss for lack of personal jurisdiction and finding defendant did not take "any actions that are the subject of this litigation," because defendant "used third parties who sent the emails of which Plaintiff complains,") and *Lacon v. Educ. Principle Found*, 2022 U.S. Dist. LEXIS 110160, at *8 (D. E.D. Penn. Jun. 22, 2022) (dismissing for lack of personal jurisdiction because defendant "did not place calls to Pennsylvania, supervise or direct the companies that made those calls, or even monitor whether those companies made calls at all," and nothing about

1  defendant's "role demonstrates any particular focus on or targeting of Pennsylvania."). However,
2  Mr. Owen is hopelessly misguided. Despite being in receipt of this complaint for many months, he
3  still seems to believe he is litigating *Lynch v. AML Network Ltd.*, CV 21-3574-GW-RAOx (C.D.
4  Cal. Sep. 27, 2021). In *Lynch,* plaintiff's argued, inter alia, that AML's [alleged] agent's actions of
5  sending spams into California, targeting California residents, and [allegedly] paying their affiliates
6  through California-based paypal constituted "minimum contacts" with the forum sufficient to haul
7  Hong Kong-based AML into the [Central] District of California. While the *instant* plaintiff
8  commends *Lynch* and their attorney's anti-spam efforts, he must concede in retrospect that their
9  *specific* jurisdiction arguments were misguided, and agrees with the Central District of California in
10 dismissing the same. Such jurisdictional arguments fail under the same legal standard argued herein
11 by Mr. Owen in the instant motion, such as *Zoobah* and *Lacoon*. However, plaintiff can promise
12 this court that the instant lawsuit was commenced shortly in the aftermath of *Lynch* based on, and
13 having learned from, *Lynch's* failure, and only after he purchased portions of the Federal/State
14 dockets of *Lynch* and "studied the failed rocket launch." When Mr. Owen cites to *Zoobah* and
15 *Lacoon* herein, he still believes he is arguing in *Lynch*. The instant plaintiff is NOT a California
16 resident, does not know or care if any of the spams were received in California or by California
17 residents, because the instant plaintiff has come to understand that nothing to that effect would
18 matter. For plaintiff to make the same arguments, on the same basis as *Lynch,* he would have to file
19 the instant suit in the District of South Dakota and argue that AML's agent's act of sending emails
20 to a South Dakota resident constitutes minimum contacts. The jurisdictional arguments herein
21 hinge on AML's direct agreement with the Google TOS, and the relevance of its material breach of
22 said agreement in violating the rights of other google users by sending spam to a gmail address that
23 happens to be furnished. by plaintiff. However, if that argument fails, this court should transfer this
24 case to the District of Arizona:
25 **"Plaintiff's claims do not fall within the zone of interests for SD's Anti-Spam Law...the**
26 **[residency] program does not, on its own, establish residency in South Dakota."**
27 Mr. Owen blindly attacks the existence of, or legitimacy thereof, of Plaintiff's South Dakota
28

residency.  Please see Plaintiff's true and correct copies of South Dakota residency documents, attached hereto as Exhibit A. Most importantly, his signed "residency affidavit" required of all full-time travelers who obtain South Dakota residency via the same program. The sworn statement under stiff penalties that Plaintiff surrendered his previous residence, and sworn intention to return to South Dakota after his [full-time traveling], spent time in the state while establishing this residency, and continues to maintain a PMB (Personal Mail Box) address as required by South Dakota (NOT a PO Box). All of this is material to the legitimacy plaintiff's new residency and domicile. Plaintiff never visits a country with the intention of making it a permanent home, arrives on tourist visas (if any is required) and typically departs a given country in approximately 30 days, having created no ties with that particular nation, nor the next. (and so on and so on). Once Plaintiff's South Dakota residency was established "To change one's domicile "requires the confluence of (a) physical presence at the new location with (b) an intention to remain there indefinitely." Factors that may be considered when determining domicile include "current residence, voting registration and voting practices, location of personal and real property, location of brokerage and bank accounts, location of spouse and family, membership in unions and other organizations, place of employment or business, driver's license and automobile registration, and payment of taxes."*Littenberg v. Raskin*, 2:15-cv-02135 JWS (D. Ariz. Jan. 12, 2016) The instant plaintiff has no car, is registered to vote in South Dakota and intends to do so in the upcoming midterms, has a South Dakota drivers license, and will file for taxes as a South Dakotan in October. In 2021, plaintiff filed a tax return for 2020, and in 2020 he was not yet a South Dakota resident. All of plaintiff's property goes with him, from place to place, in his three suitcases, and has no permanent home or apartment. Nor is plaintiff the first full-time traveler to obtains South Dakota residency the same way, for the same reasons:

https://www.keloland.com/keloland-com-original/spend-one-night-here-and-you-can-be-a-south-dakota-resident/

https://gnomadhome.com/becoming-south-dakota-residents/#:~:text=You%20only%20need%20to%20be,maintain%20a%20valid%20driver's%20license!

https://www.thewaywardhome.com/how-to-become-a-south-dakota-resident/

https://rvleaguers.com/how-to-establish-residency-in-south-dakota-as-a-full-time-traveler/

1. https://hi-van.com/why-residency-in-south-dakota-is-great-for-american-van-life/
2. To invalidate plaintiff's residency would suggest that South Dakota is allowing thousands of non-
3. residents to vote in its local, state, and federal elections, in the greatest voter fraud in American
4. History, and that South Dakota is issuing non-commercial drivers licenses to non-residents, AND is
5. allowing thousands of non-residents to avoid state-level income taxes by fraudulently declaring
6. South Dakota to be their state of residence. All of these are absurd, and mimic Mr. Owen's
7. arguments to the same effect, absurdity, and frivolousness thereof.

**If This Court Lacks Jurisdiction, It Should Transfer To Dist. Of Arizona, NOT Dismiss *Id***

Plaintiff believes strongly in the existence of personal *specific* jurisdiction of this court over AML for the instant case, but alternatively this matter should be transferred to the Dist. Of Arizona instead of dismissing it.  As argued earlier, AML admits ownership of many-or-all of the domains which were advertised in the spams. "Attached hereto as Exhibit B1 through B5, are true and correct copies of the terms and conditions for each of the Websites." (Declaration of Chan Kai Yu Rudy, ¶22).  All of those domains are hosted at Phoenix-based registrar "Namecheap." AML consented to the jurisdiction of the State and Federal Courts of Maricopa County, when it agreed to the NameCheap Registration Agreement, and subsequently violated its terms just as it had Google's similar terms. The full agreement is available here:

https://www.namecheap.com/legal/domains/registration-agreement/

Alleged material violations of this agreement, which directly gave rise to, and are related to, this cause of action, include but are not necessarily limited to:

*1. Agreement not to use "services" for improper purpose and prohibited activities.*

  *1. violate the laws, regulations, ordinances or other such requirements of*

  *any applicable Federal, State or local government, including those that*

  *relate to privacy, data collection, consumer protection (including in*

  *relation to misleading and deceptive conduct) and applicable*

  *consumer laws in respect of fair lending, debt collection, organic*

*farming (if applicable), disclosure of data and financial regulation;*

*2. transmit any unsolicited commercial or bulk email, not to be engaged*

*in any activity known or considered to be spamming or Mail*

*Bombing;*

*3. use the Services for fraudulent or deceptive practices, counterfeiting*

*or otherwise engaging in activity contrary to applicable law.*

This cause of action directly arises out of AML's breach(es) of its contract with NameCheap Inc, and AML consented to the personal jurisdiction of the State and Federal Courts of Maricopa County AZ NOT ONLY FOR DISPUTES BETWEEN AML AND NAMECHEAP, BUT ALSO FOR "third party disputes (i.e., disputes between you and another party, not us) concerning or arising from use of domain names registered hereunder"

Therefore, unlike in the Google-case-for-personal-jurisdiction in the Northern District of California, AML is alleged to have directly consented to the personal jurisdiction of the District of Arizona for third party disputes arising out of or relating to the use of these domains.

Nor does it matter that AML may have utilized Namecheap's proxy-registration service provider, Iceland-based "Withheld For Privacy ehf," because AML still agreed to the Namecheap Domain Registration agreement.  Further, this very question has been litigated before in the District of Arizona, and the outcome was plaintiff-friendly in *Facebook Inc. v. Namecheap Inc.*, No. CV-20-00470-PHX-GMS (D. Ariz. Nov. 10, 2020) "It is not necessary to resolve whether WhoisGuard consented to the Registration Agreement, however, as WhoisGuard is bound by the Registration Agreement's forum selection clause regardless of whether it is a signatory"

"Where the alleged conduct of nonparties is closely related to the contractual relationship, "a range of transaction  participants, parties and non-parties, should benefit from and be subject to forum selection clauses." Manetti-Farrow, Inc. v. Gucci Am., Inc., 858 F.2d 509, 514 n.5 (9th Cir. 1988). See, e.g., Holland Am. Line Inc. v. Wartsila N. Am., Inc., 485 F.3d 450, 456 (9th Cir. 2007).

In *Facebook,* as cited above, Plaintiff Facebook Inc (now Meta) argued its trademarks were being infringed through the registration of domains at Namecheap.  Those domains were similarly proxy-

registered, through Namecheap's then-privacy-provider Panama-based "WhoisGuard Inc." WhoisGuard failed to disclose the true domain owner within the seven (7) day period allowed to it under the Registrar Accreditation Agreement's section 3.7.7.3, as implemented into the Namecheap Domain Registration Agreement.  Accordingly, Facebook sued Namecheap and Whoisguard in the District of Arizona.  Whoisguard is a Panama registration whose only relevant in-forum contact was that it was the legal 'registrant' of the domains in question, in lieu of the true domain owner.  The court denied Whoisguard's motion to dismiss, finding "WhoisGuard is bound by the Registration Agreement's forum selection clause regardless of whether it is a signatory."  Here, AML is alleged to be a direct signatory to the domain registration agreement, but even if it isn't, "AML's conduct is closely related to the contractual relationship" to the extent that it is "bound by the Registration Agreement's forum selection clause regardless of whether it is a signatory."  Mr. Owen argues "[E]ven if AML had entered into some type of agreement with NameCheap, Inc. and / or ENOM, Inc. for purposes of obtaining the domain names, and thus had consented to their terms and conditions, that would be sufficient only for purposes of a dispute between AML and NameCheap, Inc. and / or ENOM, Inc."  Mr. Owen is incorrect.  The Namecheap domain registration agreement's forum selection clause specifically states it applies to "third party disputes (i.e., disputes between you and another party, not us) concerning or arising from use of domain names registered hereunder."  The instant matter is precisely the type of third party dispute the clause was intended to apply to.

**"Plaintiff has not plead that he suffered any injury in fact...By failing to do so, he cannot establish Article III standing."**

Mr. Owen has a short memory.  Just under one year ago, he represented AML is the Central District of California in *Lynch*.  The *Lynch* <u>plaintiffs</u>' counsel, arguing for remand, argued that their statutory claims ($1000/email in statutory liquidated damages, just like the instant case,) did not constitute an "injury in fact," and as such, the case must be remanded.  The Central District of California disagreed, and found that while an alleged *procedural* violation did not satisfy article III standing, an alleged violation of a *substantive* provision which 'protects concrete interests' does satisfy article III standing.  "In determining whether a statutory harm is sufficiently concrete to be

an injury in fact, a court looks to whether the statute codifies a substantive or a procedural right. See *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 982-83 (9th Cir. 2017). A substantive provision 'protects concrete interests, ' so the plaintiff need only plead a violation of that provision to establish an injury in fact. Id. at 983; see also *Silverstein v. Keynetics, Inc.*, No. LACV1804100JAKAGRX, 2018 WL 5795776, at *7 (C.D. Cal. Nov. 5, 2018) ('Where a statute codifies a substantive right, a plaintiff need not plead any additional harm beyond a violation of the statute to obtain standing.'). A claim under a procedural provision, on the other hand, needs to be accompanied by allegations of a concrete harm in order to establish the requisite injury in fact. Id. at 982; see also *Spokeo* I, 136 S.Ct. at 154 (A plaintiff may not "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III.'). " *Lynch v. AML Network Ltd.*, CV 21-3574-GW-RAOx (C.D. Cal. Sep. 27, 2021).  Mr. Owen argued precisely the opposite in Lynch of what he argues now in *Lapin*, and he should be judicially estopped from advancing an argument that he demonstrably does not believe in, and in fact opposes, himself.

**"Plaintiff also fails to allege receipt of emails in South Dakota or similar nexus for his claims."** Plaintiff was not in South Dakota at the time he received the spams, but that is irrelevant to the claim.  Congress agrees.  The CAN-SPAM Act of 2003, found in its Congressional Findings And Policy, Sec. 2(a)(11) "...an electronic mail address does not specify a geographic location, it can be extremely difficult for law-abiding businesses to know with which of these disparate statutes they are required to comply."  Accordingly, as Congress and Federal Spam legislation declares email addresses to be not associated with a geographic location.  In the latter-part of the above-quoted Sec. 2(a)(11), congress found "it can be extremely difficult for law-abiding businesses to know with which of these disparate statutes they are required to comply."  Congress solved this very problem by creation a nationwide, uniform standard, such that email marketers knew exactly what requirements  it must comply with in order to lawfully send commercial email. It ensured that no state law could disrupt this nationwide, uniform standard by preempting state-level spam laws, including the *instant* cause of action "except to the extent that any such statute,

regulation, or rule prohibits falsity or deception in any portion of a commercial electronic mail message or information attached thereto."

Each and every allegation in the *instant* suit, brought under Plaintiff's home-state cause of action, is also declared to be an act of "Fraud and related activity in connection with electronic mail" in the CAN-SPAM Act's Sec. 1037, notably:

Sec 1037 (a)(2): "uses a protected computer to relay or retransmit multiple commercial electronic mail messages, with the intent to deceive or mislead recipients, or any Internet access service, as to the origin of such messages"

Sec 1037 (a)(3): "materially falsifies header information in multiple commercial electronic mail messages and intentionally initiates the transmission of such messages"

Sec 1037 (a)(4): "registers, using information that materially falsifies the identity of the actual registrant, for five or more electronic mail accounts or online user accounts or two or more domain names, and intentionally initiates the transmission of multiple commercial electronic mail messages from any combination of such accounts or domain names"

Accordingly, the CAN-SPAM ACT deems the very acts of which plaintiff complains to be unlawful, established a nationwide, uniform standard, and enables states to regulate falsity and deception in spams, so long as they do not disrupt this nationwide, uniform standard, and the instant claims fit comfortably within that preemption.  The defendants could not have advertised through, and/or initiated spams FROM the United States or TO any American and expect the same to be lawful.  If it does anyway, it is well-aware that these acts of fraud are illegal under federal law, and may be regulated in complementary, non-contradictory format to this Federal Standard by federal and/or state legislation. Mr. Owen's argument is therefore frivolous.  Nor does it matter whether plaintiff was physically located in South Dakota at the time he received the spams.  This can be further demonstrated, and Mr. Owen's "zone of interests" argument fully disposed of, with a simple exercise as follows:  If an Arizona resident/domicile is visiting Mount Rushmore, South Dakota, and receives spam emails while appreciating the monument, such an Arizona resident would **NOT** have any

protection from South Dakota's spam law because *supra* only applies when a spam email is sent FROM South Dakota or TO a South Dakota resident:

**37-24-47. Prohibited commercial e-mail advertisements.**

No person may advertise in a commercial e-mail advertisement either <u>sent from South Dakota or sent to a South Dakota electronic mail address</u> under any of the following circumstances:
(1) The e-mail advertisement contains or is accompanied by a third-party's domain name without the permission of the third party;
(2) The e-mail advertisement contains or is accompanied by falsified, misrepresented, or forged header information;
(3) The e-mail advertisement has a subject line that a person knows would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message.

In the interest of completeness, a "South Dakota electronic mail address" is defined as any of the following, none of which apply to our hypothetical AZ resident who received spams while in SD:

(14) "South Dakota electronic mail address" or "South Dakota e-mail address," any of the following:
(a) An e-mail address furnished by an electronic mail service provider that sends bills for furnishing and maintaining that e-mail address to a mailing address in this state;
(b) An e-mail address ordinarily accessed from a computer located in this state; or
(c) An e-mail address furnished to a resident of this state;

Next, we have a South Dakota resident. Let's use plaintiff Joshua Lapin for this example. He is visiting the Grand Canyon in Arizona. He receives spams while admiring the Grand Canyon's natural beauty. He is afforded **NO** protection by Arizona's spam law (ARS 44-1372 *et seq*) since he is not an Arizona resident, and Arizona's spam law only applies when: [44-1372.01]

E. The prohibitions in this section shall apply to any person doing business in this state and to any person who transmits a commercial electronic mail message by any of the following:

1. From a computer located in this state.

2. To an electronic mail address that the sender knows, or has reason to know, is held by a resident of this state.

3. To an interactive computer service with equipment or its principal place of business in this state.

13
COMPLAINT

Accordingly and therefore, under the spam laws of Arizona and South Dakota [and California's too], each states residents are protected by their home-states laws, not people who are fortuitously located within the geographical bounds of the state at the fortuitous time at which a spam email is received.

Perpendicular to Mr. Owen's argument, had plaintiff been a non-South Dakota resident, visiting South Dakota at the time he received the *instant* spams, he would NOT have a remedy under South Dakota law even though South Dakota would have been the "place where the injury occurred," and therefore Plaintiff would fall outside the "zone of interests" of South Dakota's spam law even though he would have been physically located in South Dakota at the time of receipt of the spams! Plaintiff is a legal resident and domicile of South Dakota, and that is all that matters for the purposes of standing under the cause of action, and places him comfortably within the zone of interest of the same.  Nor is it unacceptable for the instant cause of action to govern receipt of spam emails received outside the State of South Dakota.  "The dormant commerce clause acts as a brake on the states' authority to regulate in areas in which Congress has not affirmatively acted." *Daniel Balsam, referencing* Camps Newfound Owatonna, Inc. v. Town of Harrison, 520 U.S. 564, 571 (1997).  As demonstated, Federal Legislation by and through the CAN-SPAM Act of 2003 has "affirmatively acted...in this area" and has expressly authorized the states to regulate falsity and deception in commercial email in its savings clause: " IN GENERAL.--This Act supersedes any statute, regulation, or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail to send commercial messages, except to the extent that any such statute, regulation, or rule prohibits falsity or deception in any portion of a commercial electronic mail message or information attached thereto."  This exact issue has been litigated extensively in-and-out of California, at least three times.  Each time a trial court has ruled that a spam statue violates the dormant commerce clause because it seeks to regulate

email received outside its borders, it has been overturned on appeal, including in the California Court of Appeals.  See *State of Washington v. Heckel*, 24 P.3d 404, 411, 412 (Wash. 2001), *MaryCLE, LLC v. First Choice Internet, Inc*, *Ferguson v. Friendfinders Inc*., 94 Cal. App. 4th 1255, 1262 (1st Dist. 2002).

**"There is also not jurisdiction in this Court because Plaintiff agreed to litigate any disputes in Hong Kong...Plaintiff agreed to the "Terms of Use."**

This frivolous argument reminds plaintiff of the physics of the Looney Tunes's "Roadrunner and Coyote" cartoon.  Plaintiff's only interactions with AML's websites, including but not limited to the Terms of Use agreements on AML's websites, arose from his investigation of the spams at issue in this case.  If this unreasonable forum selection clause would be enforced, it would suggest that any private citizen, [state] attorney general, FBI, CIA, or other government agency that visits any suspect's website in furtherance of their private investigation of an internet-based tort/crime, would be "trapped" by its foreign forum selection clause, and the private-or-government plaintiff(s) would be rendered unable to enforce their own laws in the courts of the United States.  Plaintiff would know nothing of the existance of AML Network Limited, the "Qpid Network," or its/their "websites" had it not been for AML advertising those same websites in countless obnoxious spams sent to him absent his consent.  Nothing herein shall be construed to waive the right to file an action in the District Court and/or High Courts of the Special Administrative Region of Hong Kong for any/all alleged violations of the Hong Kong's Unsolicited Electronic Messages Ordinance (Cap. 593) "Hong Kong Anti-Spam Law," in addition to the instant lawsuit and the instant cause of action arising out of the laws of South Dakota.

**"Strict liability does not relieve Plaintiff of his burden of alleging AML is somehow at fault for the alleged harm"**

Plaintiff argues and alleges throughout the complaint that AML "advertised" in the spams, which is

more than sufficient to allege it is "at fault for the alleged harm." This court agrees pursuant to its own findings in *Blanchard* (as cited earlier). California State Court also agrees, In *Hypertouch, Inc. v. ValueClick, Inc.*, the court noted that "[S]ection 17529.5 was intended to apply to entities that advertise in deceptive commercial e-mails, not only the spammers who send them," *Id.* See also, "[W]e hold that a recipient of a commercial email advertisement sent by a third party is not precluded as a matter of law from stating a cause of action under section 17529.5 against the advertiser for the third party's failure to provide sufficient information disclosing or making traceable the third party's own identity. We further hold that such a cause is not precluded simply because such an email sufficiently identifies the advertiser." *Greenberg v. Digital Media Solutions, LLC*, 65 Cal.App.5th 909 (Cal. Ct. App. 2021).

**Conclusion**

This court has personal jurisdiction over AML, but even if it doesn't, the District of Arizona does, and justice would be best-served with an intra-district transfer, rather than a dismissal. Plaintiff has standing under the cause of action since he is a South Dakota resident within the zone of interests of the South Dakota Anti-Spam law, and has Article III standing to bring this claim in Federal Court. Finally, a claim upon which relief can be granted has been stated against Defendant AML Network Limited.

**Certificate of Service**

This motion will be served onto AML Network Limited's counsel, Brent Owen of Squire Patton Boggs (US) LLP, through CM/ECF. A courtesy copy will also be sent by email to Mr. Owen and staff.

/s/ Joshua A. Lapin
Joshua A Lapin
Pro Se Plaintiff 10/06/22
_____

Signature